**OKC CORPORATION,**
**Plaintiff-Appellant,**

v.

**DEPARTMENT OF ENERGY,**
**Defendant-Appellee.**

**No. 5–41.**

Temporary Emergency Court of Appeals.

Argued Nov. 16, 1979.
Decided Dec. 28, 1979.

Fritz-Alan Korth, Korth & Korth, Washington, D. C., and Robert L. Meyers, III, Meyers, Miller, Middleton & Weiner, Dallas,. Tex. (David J. White, Meyers, Miller, Middleton & Weiner, Dallas, Tex., with them on brief), for plaintiff-appellant OKC Corporation.

Barbara L. Gordon, Atty., Civ. Div., Dept. of Justice, Washington, D. C. (Alice Daniel, Acting Asst. Atty. Gen., Washington, D. C., Kenneth J. Mighell, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., and Dennis G. Linder and C. Max Vassanelli, Attys., Civ. Div., Dept. of Justice, Washington, D. C., with her on brief), for defendant-appellee Department of Energy.

Before CHRISTENSEN, FRANK M. JOHNSON, Jr., and BECKER, Judges.

FRANK M. JOHNSON, Jr., Judge.

OKC Corporation appeals from a summary judgment order of the United States District Court for the Northern District of Texas upholding a decision of the Federal Energy Administration.

The factual background of the controversy is not in dispute. In 1974, acting pursuant to the Emergency Petroleum Allocation Act, the Federal Energy Office issued regulations instituting a two-tiered system of crude oil pricing. The regulations put a price ceiling on 1972 production level crude ·oil (so-called "old crude") but left the price of most other crude oil uncontrolled. Because refiners did not have equal access to the old, cheaper crude, the system caused significant competitive distortions. The FEA attempted to eliminate these distortions through an "entitlements" program. Under the program, refiners using a higher than average percentage of old crude were required to buy entitlements, while refiners using a lower than average percentage were allowed to sell entitlements. The program was an effort to distribute the old crude price advantage equally among all refiners without the necessity for actual physical allocation of the old crude.

This program proved a real burden for certain financially troubled small refiners which did have access to old crude supplies. The FEA initially granted these refiners "exception relief" on a case-by-case basis. *See, e. g., Delta Refining Co.,* 2 FEA ¶ 83,275 (September 11, 1975). In late 1975,

however, Congress passed the Energy Policy and Conservation Act, authorizing a blanket small refiner exemption. *See* 15 U.S.C. § 753(e). In January, 1976, the FEA implemented this exemption, but warned that it might give some small refiners an unwarranted competitive advantage.[1] By May, 1976, the FEA determined that this was the case, revoked the exemption pursuant to a special procedure provided in the EPCA, and reinstituted the determination of relief case by case based on a small refiner's financial need.[2]

In March, 1976, OKC Corporation, a small refiner that had been covered by the January, 1976, blanket exemption, filed a petition for exception relief in anticipation of the exemption's revocation. On June 14, 1976, the FEA denied the petition. Based on evidence submitted by OKC, the agency concluded that, although the company would incur substantial entitlement purchase obligations in the first of the remaining two quarters of the fiscal year, these obligations would be offset by substantial entitlement sales during the final quarter. The FEA thus found that OKC would not suffer serious hardship as a result of the program and thus was not entitled to exception relief.[3] A week later, the FEA modified this order to allow the company to 'net out' its sale and purchase obligations for the remainder of the fiscal year in order to avoid unnecessary disruption of its cash flow. On November 22, 1976, the FEA denied a subsequent OKC request for relief. OKC appealed this denial, and on April 14, 1977, the FEA denied the appeal. On May 18, 1977, OKC challenged these denials in the United States District Court for the Northern District of Texas. On June 13, 1979, the district court granted summary judgment to the Department of Energy. On July 12, 1979, OKC filed this appeal. There is no question as to our jurisdiction.

OKC's principal contention is that the FEA's use of a netting analysis consti-

tuted a departure without advance notice from prior FEA practice, that OKC was entitled to relief under the prior practice, and thus that OKC is entitled to relief here.

As the district court found, this argument is without merit. A review of pre-OKC decisions indicates that the netting analysis was not a departure from prior agency practice. Refiners seeking relief from entitlement purchase obligations typically did not have offsetting sales opportunities. But, as this Court has recognized, *see Husky Oil Co. v. Department of Energy,* 582 F.2d 644, 647 (Em.App.1978), where there were purchases and sales to net, the FEA did so. *See, e. g., Delta Refining Co.,* 2 FEA ¶ 83,078, at 83,230 (March 28, 1975). OKC's may have been the first case in which the FEA called attention to the practice, but in so doing the agency was merely stating what was or should have been obvious.

OKC's second contention is that the use of a netting analysis was outside the scope of the FEA's authority. OKC claims that Congress wanted exception relief to be granted to financially troubled small refiners regardless of whether their financial troubles were related to the entitlements program. According to OKC, the relevant FEA inquiry was not whether a refiner had been unduly burdened by the program and deserved relief but rather whether the refiner's overall financial situation was such that it deserved a government subsidy in the form of exception relief.

This argument is also without merit. OKC would make of the entitlements program a general welfare program for the assistance of small refiners. This interpretation is supported in a general way by the Emergency Petroleum Allocation Act, which states, although ambiguously, that one of the Act's many purposes is to foster competition and "preserve the competitive viability of . . . small refiners," 15

---

1. *See* Special Rule No. 6.

2. *See* Energy Action No. 2.

3. Actual year-end figures revealed that, contrary to predictions, OKC had a net purchase obligation of $49,174 for the period in question. The FEA granted OKC this sum in relief on July 14, 1977.

U.S.C. § 753(b)(1)(D), and by the old Energy Policy and Conservation Act blanket exemption, which relieved small refiners from entitlement purchase obligations without regard to the extent of their entitlement sales. But the code section authorizing the FEA to grant exception relief "as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens" does not readily suggest such an interpretation. 15 U.S.C. § 766(i)(1)(D). Congress clearly did not want the entitlements program to hurt small refiners, but it is unlikely that Congress intended the program to affirmatively support them. If Congress had had such an intent, it would have made this intent clear.

OKC claims that the FEA denials were also irrational and unsupported by substantial evidence. These claims have no basis. First, application of a netting analysis to OKC's petition for relief was clearly rational. Netting projected sales and purchases indicated whether OKC would be harmed or benefited by the entitlements program during the remainder of the relevant fiscal year. Second, the FEA finding that OKC would be a net seller of entitlements during the 1976 fiscal year was based on evidence submitted by OKC. According to an OKC affidavit, this evidence "reflected a projected net entitlement sales benefit of $26,708." In its subsequent petition for relief, OKC did submit new evidence, which the FEA apparently did not consider, projecting that it would be a net purchaser. But when actual year-end figures showed the initial net seller projection to be wrong, the FEA eventually corrected the error with a compensatory award.[4]

AFFIRMED.